North Carolina Department of Revenue; Harlon Boyles, Treasurer of the State of North Carolina, Defendants.

No. 90–1110.

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1991.

Decided June 25, 1991.

Norman W. SWANSON, Henry F. Murray, Carl L. Whitney, William Z. Nicholson, III, Charles L. Dancey, Melvin F. Eyerman, Ira N. Schwarz, John L. Powell, Jr., Galena Elworth, Donald V. Wallace, William E. Denton, Robert A. Nisbet, Walter J. Bartnikowski, Ralph

John Robbins Wester, David C. Wright, III, Robinson, Bradshaw & Hinson, P.A., Charlotte, N.C., argued (Lacy H. Thornburg, Atty. Gen. of North Carolina, Marilyn R. Mudge, Asst. Atty. Gen., Raleigh, N.C., on brief), for defendant-appellant.

Wallace R. Young, Jr., Womble, Carlyle, Sandridge & Rice, Charles H. Taylor, argued (G. Eugene Boyce, Donald L. Smith, Jasper L. Cummings, Jr., Mark E. Richardson, III, Womble, Carlyle, Sandridge & Rice, Winston–Salem, N.C., on brief), for plaintiffs-appellees.

Before SPROUSE and WILKINSON, Circuit Judges, and MacKENZIE, Senior District Judge for the Eastern District of Virginia, sitting by designation.

WILKINSON, Circuit Judge:

Helen Powers, former Secretary of Revenue for the state of North Carolina, faces potential liability of $140 million for her actions in enforcing the state revenue code. According to complainant taxpayers, Secretary Powers collected taxes from them during a four-year period when she should have known that to do so violated both the constitutional doctrine of intergovernmental tax immunity and the Public Salary Tax Act of 1939. Because the law that plaintiffs claim Powers violated was not clearly established at the time, however, we hold that she is entitled to immunity from suit and reverse the judgment of the district court.

I.

Under North Carolina law as of early 1989, former state and local government employees received a state income tax exemption for the full amount of their retirement benefits. Former federal civil service and military personnel could exempt up to $4000 of their retirement benefits. Private sector retirees in North Carolina received no exemptions, however.

On March 28, 1989, the United States Supreme Court reversed a decision of the Michigan Court of Appeals and declared unconstitutional a Michigan taxation scheme that was similar to North Carolina's in that it granted state income tax exemptions to retired state employees, but not to either federal or private retirees. *See Davis v. Michigan Dep't of the Treasury*, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). The Court held that such a tax system discriminated against the federal government and thus violated the constitutional doctrine of intergovernmental tax immunity as well as the Public

Salary Tax Act of 1939, codified, as amended, at 4 U.S.C. § 111. That decision affected approximately twenty states which had enacted exemptions similar to those promulgated by Michigan.

Two weeks after the *Davis* decision was announced, plaintiffs brought a class action under 42 U.S.C. § 1983 on behalf of all federal retirees residing in North Carolina (the "Class A" plaintiffs), seeking a refund of unconstitutional taxes paid for the tax years 1985 through 1988. The suit named as defendants the North Carolina Department of Revenue as well as various state officers in both their official and individual capacities. Defendant Helen Powers was Secretary of the North Carolina Department of Revenue during the relevant period.[1] Plaintiffs claimed that to give retired state employees a greater exemption than that granted to retired federal employees comprised unconstitutional discrimination under the doctrines underlying *Davis*. A second group of plaintiffs consisting of active-duty military personnel and reservists (the "Class B" plaintiffs) was later allowed to join the suit. They challenged a $1500 state income tax exemption granted to members of the North Carolina National Guard. While both classes of plaintiffs continue to pursue their claims against the state, they alternatively seek to hold Secretary Powers personally liable for the $140 million they claim to have overpaid.

Powers moved to dismiss the suit against her on the grounds of qualified immunity. Although she conceded that under *Davis* the unequal exemptions for federal and state retirees were unconstitutional,[2] she claimed that her conduct in enforcing the North Carolina revenue statutes from 1985–88 did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The district court denied the motion, ruling that the Supreme Court's decision in *Davis*

was "inevitable" and that Powers should have known that she was collecting unconstitutional taxes. In so holding, the court pointed to the "long-standing principles" underlying the decision in *Davis*, specifically, the doctrine of intergovernmental tax immunity and the Public Salary Tax Act of 1939.

Powers appeals from the court's denial of her motion for dismissal.

## II.

■ Government officials who are performing their official duties are generally shielded from liability for civil damages. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. Immunity from personal liability "reflects the concern that civil damages awards against public officers for every judicially determined violation of constitutional rights would prove too expensive to the public, discourage public service employment and impair governmental decision-making." *Tarantino v. Baker*, 825 F.2d 772, 774 (4th Cir.1987). We believe that to hold Secretary Powers liable because she failed to accurately predict the outcome of the *Davis* decision would work a miscarriage of justice leading to exactly such unacceptable consequences.

In this section we examine the law as it existed prior to the Supreme Court's decision in *Davis* and conclude that a reasonable state official would not have known that North Carolina's tax system was unconstitutional because at that time the law was not clearly established. Section III discusses the Secretary's potential liability to the Class A plaintiffs for her actions following *Davis*, and the final section examines aspects of the Class B plaintiffs' claims.

## A.

■ Only violations of those federal rights "clearly recognized in existing case

---

**1.** Powers has since resigned, effective April 30, 1990, and is thus being sued now only in her individual capacity.

**2.** A few months after the *Davis* decision was announced, the North Carolina General Assembly amended its revenue statutes to treat federal and state retirees equally effective January 1, 1989.

law" will support an award in damages under 42 U.S.C. § 1983. *Danenberger v. Johnson,* 821 F.2d 361, 365 (7th Cir.1987). Public officials must be able to discharge their public duties free of an omnipresent fear of § 1983 liability. Only in that way can we be sure that government can continue to function efficiently while liability will fall properly upon only "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

This tolerance for a range of reasonable public actions is particularly important for those who must interpret often imprecise or incomplete legal precedent. "For the law, as lawyers best know, is full of perplexities." *Pennekamp v. Florida,* 328 U.S. 331, 371, 66 S.Ct. 1029, 1049, 90 L.Ed. 1295 (1946) (Rutledge, J., concurring). The dockets of courts are testaments in a sense to the many questions that remain reasonably debatable. Holmes touched on this uncertain process when he defined "the law" as "[t]he prophecies of what the courts will do in fact, and nothing more pretentious." O.W. Holmes, *The Path of the Law,* in The Common Law & Other Writings 173 (1982).

In interpreting qualified immunity then, we must appreciate the fact that the direction of the law may be difficult to ascertain. Thus, although public officials may be "charged with knowledge of constitutional developments, [they] are not required to predict the future course of constitutional law." *Lum v. Jensen,* 876 F.2d 1385, 1389 (9th Cir.1989). "A reasonable government official cannot necessarily be expected to recognize the significance of a few scattered cases from disparate areas of the law ..." *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985). The requirement, after all, is that the law be clearly established, not simply possibly established or even probably established. Since qualified immunity is appropriate if reasonable officers could disagree on the relevant issue, *Sevigny v. Dicksey,* 846 F.2d 953, 957

(4th Cir.1988), it surely must be appropriate when reasonable jurists can do so.

## B.

■ The question of clarity bears directly upon plaintiffs' contentions that Secretary Powers is personally liable for the $140 million that she collected in unconstitutional taxes from them during the years 1985–1988. They argue that even before *Davis* was decided, the doctrine of intergovernmental tax immunity as well as 4 U.S.C. § 111 clearly established their right not to be taxed in a discriminatory manner, and that a reasonable Secretary of Revenue would have recognized that North Carolina's tax system was discriminatory.

We disagree. Secretary Powers was enforcing a long-standing statute that was similar to enactments elsewhere. The most pertinent judicial decisions had upheld comparable taxing schemes and the doctrine of intergovernmental tax immunity was, at best, ambiguous. We decline to proclaim in hindsight after the *Davis* decision that the unconstitutionality of differential tax exemptions had been clear all along.

Before turning to the specific case law, we will examine briefly the general legal landscape surrounding the tax exemptions at issue here. Nothing in that terrain demonstrates that Powers was remiss in her duties or that she knowingly violated plaintiffs' constitutional rights. To begin with, the tax exemption for former state employees' pensions had been in effect and unchallenged for nearly fifty years. Plaintiffs argue that federal retirees had been complaining of unfair taxation since at least 1979, but they point to no legal action resulting therefrom. In addition, nearly twenty other states had promulgated and were enforcing similar tax exemptions for former state employees. In short, Secretary Powers was administering a statute which had been continually enforced for decades and which was far from unique.[3] Nothing in these circumstances would have indicated anything other than business as

---

**3.** We do not, of course, imply that enforcement of a statute unique to a single state would result on that account in a loss of immunity. Such a

rule would unduly penalize innovation in state government.

usual to a state officer who had sworn to uphold the laws of her state.

Rarely will a state official who simply enforces a presumptively valid state statute thereby lose her immunity from suit. "Legislative classifications ... are presumed to be constitutional." *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 17, 108 S.Ct. 2225, 2236, 101 L.Ed.2d 1 (1988). Absent extraordinary circumstances, which are not present here, liability will not attach for executing the statutory duties one was appointed to perform. *Lemon v. Kurtzman*, 411 U.S. 192, 207–09, 93 S.Ct. 1463, 1472–73, 36 L.Ed.2d 151 (1973). Government would come to a virtual standstill if executive officials concluded that their safest course of action was to ignore the laws of the state and to take no course of action for fear of liability. Reliance upon the presumptive validity of state law may be "the paradigm" of objectively reasonable conduct that the grant of immunity was designed to protect. *Landrum v. Moats*, 576 F.2d 1320, 1327 n. 14 (8th Cir.1978). The usual practice must therefore be that "[u]ntil judges say otherwise, state officers ... have the power to carry forward the directives of the state legislature." *Lemon*, 411 U.S. at 208, 93 S.Ct. at 1473. Plaintiffs have not shown anything here that would cause us to abandon this rule.

Turning next to the case law, we note that in determining whether the law is clearly established, the vintage of the asserted right is of less guidance than the specificity of the right. The right to due process, for example, might be considered clearly established because of the Constitution's Due Process Clause; however, "if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Rather, the "contours of the right" must have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional. *Id.* at 640, 107 S.Ct. at 3039. We do not, of course, interpret the term "clearly estab-

lished" to mean that government officials are always allowed one constitutional violation free of any liability. Nevertheless, the greater the similarity of the existing case law to the situation at hand, the greater its guidance to a reasonable state official. "[I]n the light of pre-existing law the unlawfulness must be apparent." *Id.*

The district court here stripped Secretary Powers of all immunity because it concluded that *"Davis* was inevitable." Yet the only rationale the court offered for that opinion was that "the doctrinal underpinnings of *Davis* are long-standing principles." The court's observation that the doctrine of intergovernmental tax immunity hails from the time of *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), is of little practical use to a state revenue secretary whose duty it is to administer the intricacies of a modern tax code.

Nor have plaintiffs pointed to any court decision prior to *Davis* that struck down tax exemptions like North Carolina's, despite the fact that numerous states had enacted such provisions. In fact, the only decisions addressing those laws had upheld them in the face of constitutional challenges. The case most directly on point was, of course, the decision of the Michigan Court of Appeals in *Davis v. Michigan Dept. of Treasury*, 160 Mich.App. 98, 408 N.W.2d 433 (1987), ruling that any difference in the tax treatment of state and federal retirees was constitutionally justified by reasonable differences between those two groups. A similar taxing scheme in Arkansas had survived a challenge on equal protection grounds. *See Streight v. Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983). This precedent alone suffices to show that the holding of *Davis* had not theretofore been clearly established. Even had the Michigan and Arkansas courts struck down the statutes of those states, we would be hard pressed to conclude, from the standpoint of our federal system, that a North Carolina revenue secretary must *sua sponte* cease to enforce the duly enacted tax laws of her state,

without regard for the expressions of the legislature.

Lacking supportive precedent directly on point, plaintiffs emphasize a series of Supreme Court cases that establish the so-called modern approach to intergovernmental tax immunity. *E.g., James v. Dravo Contracting Co.*, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937); *United States v. City of Detroit*, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958); *United States v. County of Fresno*, 429 U.S. 452, 97 S.Ct. 699, 50 L.Ed.2d 683 (1977). Plaintiffs maintain that the principles underlying intergovernmental tax immunity were so straightforward and easily applicable that no further precedent was necessary to lead a reasonable official to the conclusion that North Carolina's laws violated the Constitution.

We do not regard these cases as clearly establishing that Secretary Powers' actions were unconstitutional, however. As an initial matter, the modern line of cases represents a shift in emphasis away from immunity from taxation and toward limitation of such immunity. *New York v. United States*, 326 U.S. 572, 581, 66 S.Ct. 310, 314, 90 L.Ed. 326 (1946). Indeed, the vast majority of plaintiffs' cited cases held that the challenged taxes were constitutional.

More specifically, as Justice Stevens' dissent in *Davis* makes clear, the rationale behind the precedent might have suggested a different result in that case. In *United States v. County of Fresno*, 429 U.S. 452, 462, 97 S.Ct. 699, 704, 50 L.Ed.2d 683 (1977), for example, the Court wrote that a tax would not violate the doctrine of intergovernmental immunity "so long as the tax is imposed equally on the other similarly situated constituents of the State." The Court had promoted that rule as being "the best safeguard against excessive taxation." *South Carolina v. Baker*, 485 U.S. 505, 526 n. 15, 108 S.Ct. 1355, 1360 n. 15, 99 L.Ed.2d 592 (1988). The rule's potency stems from the political check that "is provided when a state tax falls on a significant group of state citizens who can be counted upon to use their votes to keep the State from raising the tax excessively, and thus placing an unfair burden on the Federal Government." *Washington v. United States*, 460 U.S. 536, 545, 103 S.Ct. 1344, 1350, 75 L.Ed.2d 264 (1983).

Because the Michigan tax applied to 4.5 million state citizens, including 24,000 federal retirees, and exempted only 130,000 retired state employees, Justice Stevens argued that an obvious political check on excessive taxation existed. Any discrimination visited upon federal retirees was additionally placed upon millions of other state citizens, so the tax burden was arguably "a matter of indifference to the Federal Government [since] it can fairly be said that federal employees are treated like other ordinary residents of the State." *Davis*, 489 U.S. at 823–24, 109 S.Ct. at 1512 (Stevens, J., dissenting). Although Justice Stevens agreed that federal employees could not be singled out to shoulder a heavier financial burden than other citizens, he asserted that "[t]he intergovernmental immunity doctrine simply does not constitute a most favored nation provision requiring the States to accord federal employees and federal contractors the greatest tax benefits that they give any other group subject to their jurisdiction." *Id.* at 823, 109 S.Ct. at 1512. Thus a state official who examined North Carolina's tax system prior to *Davis* might easily have concluded that it worked no unconstitutional discrimination. Not only were federal retirees not treated adversely *vis-a-vis* the majority of retirees and other citizens in North Carolina, but they actually were accorded a benefit denied to those others.

We discuss the contentions in Justice Stevens' dissent not with any purpose of arguing that *Davis* was wrongly decided, but simply to illustrate that persuasive arguments could be and were fashioned on both sides of the issue, grounded in the same precedent. That *Davis* was decided by a vote of 8–1 does not determine that the law was clearly established prior to that decision. We do not think it wise to set up a rule that turns on the number of appellate votes a given argument acquires. Even a unanimous opinion may have resulted from a close and controversial debate. That the Supreme Court chose to write about the

issue at all provides some degree of insight into the state of the law; presumably the Court would not squander its limited resources on an issue that was clearly settled.

Plaintiffs respond that even if the doctrine of intergovernmental tax immunity was imprecise, nevertheless 4 U.S.C. § 111 clearly should have indicated that North Carolina's taxation was illegal under federal law. Section 111 authorizes states to tax "pay or compensation for personal service as an officer or employee of the United States ... if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation." Plaintiffs argue that this statute, although facially a mere authorization to tax, additionally prohibits discriminatory taxation. Secretary Powers argues that prior to *Davis* it was not clear whether § 111 applied to retirement benefits received by former employees or whether it was limited by its very language to current employees.

We believe that Secretary Powers could reasonably have concluded that § 111 did not prohibit North Carolina's taxation system. Certainly the Michigan Court of Appeals reached a similar decision regarding the reach of § 111. *See Davis*, 408 N.W.2d 433, 435. Additionally, federal law often draws distinctions between employees and retirees. *E.g., Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 165–71, 92 S.Ct. 383, 390–93, 30 L.Ed.2d 341 (1971) ("employee" as used in National Labor Relations Act does not include "retirees"); *see also Ernzen v. United States*, 715 F.Supp. 1483, 1485 (S.D.Cal.1989) ("[n]owhere does the [tax] code define 'retirees' as 'employees.'"); 26 U.S.C. § 61(a)(1), (11) (Internal Revenue Code distinguishing between "compensation for services" and "pensions").

In short, how the intergovernmental tax immunity doctrine and 4 U.S.C. § 111 applied to North Carolina's revenue statutes was anything but clearly established prior to *Davis*. The district court erred, therefore, in subjecting a state revenue official

to personal liability because she failed to predict how the Supreme Court would rule. Because Secretary Powers acted reasonably in collecting taxes pursuant to North Carolina law, she is entitled to immunity from liability in damages for so doing.

### III.

■ The Class A plaintiffs also argue that even if Secretary Powers is entitled to immunity for her pre-*Davis* actions, she is yet liable for continuing to collect fiscal year 1988 taxes in 1989 after the Supreme Court decided *Davis*. They also complain that Powers did not accord them an adequate post-deprivation remedy for the unconstitutional taxation because "without prior notice and contrary to established official practice and advice, [she applied] a 30–day refund demand requirement" as a method of preventing refunds.

Plaintiffs' arguments, however, omit certain important considerations. First, North Carolina law distinguishes between invalid or unauthorized taxes and incorrectly computed taxes. *Coca–Cola Co. v. Coble*, 293 N.C. 565, 238 S.E.2d 780, 783 (1977); *see* N.C.Gen.Stat. §§ 105–266.1, 105–267 (1989). The thirty-day period for requesting refunds of unauthorized taxes is set by statute, not by the whims of the Secretary of Revenue. *See* N.C.Gen.Stat. § 105–267 (1989). Payment of the tax followed by a request for a refund is the exclusive means for remedying an unconstitutional tax in North Carolina. *Coca–Cola*, 238 S.E.2d at 783. Furthermore, the statutory requirement that taxpayers demand refunds of invalid taxes within thirty days of payment has been North Carolina law for approximately fifty years, which must have provided plaintiffs some minimum of notice.

Additionally, following the *Davis* decision, which was handed down on March 28, 1989, Secretary Powers sought an opinion from the North Carolina Attorney General regarding the effect of *Davis* on the state income tax system and the proper procedure for refunding unconstitutional taxes. The Attorney General's response, dated April 10, advised that under *Coca–Cola* and the appropriate statutes, "the Secre-

tary of Revenue *is not authorized* to refund any taxes imposed illegally ... unless they were paid 'involuntarily,' as indicated by a demand for refund made within 30 days of payment." (emphasis added). On April 13, Secretary Powers issued a statement to the press publicizing the procedures for taxpayers to follow to obtain refunds, as well as the thirty-day request period. According to Powers, over $9 million has since been refunded to taxpayers under state law, which is as a general matter a preferable vehicle for pursuing refunds of state taxes than a § 1983 suit.

Plaintiffs' argument that Powers "changed" the refund procedures relies substantially upon statements in income tax bulletins regarding the statute of limitations. We find this reliance misplaced because the bulletins clearly state in their preface that they "do not cover all phases of the law." In fact, only the refund procedures under Gen.Stat. § 105–266 for routine overpayments due to miscalculation are discussed; the bulletins do not mention Gen.Stat. § 105–267, which applies to refunds of unconstitutional taxes.

Plaintiffs would have had Powers act beyond her statutory authority and issue refunds spontaneously. It cannot be that a state official who enforces a valid statute and who has in good faith sought legal advice from a state attorney general will nevertheless be found liable in damages for following that statute and that advice. *See Lemon v. Kurtzman,* 411 U.S. at 208–09, 93 S.Ct. at 1473; *Lucero v. Hart,* 915 F.2d 1367, 1371 (9th Cir.1990) (reliance on counsel is evidence of good faith). It would be difficult to convince qualified citizens to enter public service if they faced the possibility of paying damages because they followed the law or did not include in a general informational pamphlet all the statutory minutiae of a complex tax code. Secretary Powers is entitled to immunity for her actions with respect to collecting 1988 taxes from the Class A plaintiffs.

## IV.

The Class B plaintiffs are active duty national military personnel and reservists. They complain that they were discriminated against as federal employees in violation of the intergovernmental tax immunity doctrine because members of the North Carolina National Guard received an annual tax exemption of $1500 while they did not receive any exemption. *See* N.C. Gen.Stat. § 105–134.6(b)(4) (1989).[4] They additionally protest that Secretary Powers continued until July 1990 to collect their taxes despite the decision in *Davis* and has denied all their refund requests.

Powers responds that the $1500 exemption for the National Guard was not unconstitutional. She maintains that the plaintiffs' argument is based on the alleged similarity between their jobs and a National Guardsman's job and that in reality those jobs are sufficiently dissimilar to justify differential tax treatment. Her second argument is that any discriminatory treatment is not unconstitutional because it is between two types of federal employees. Section 111, which "is coextensive with the prohibition against discriminatory taxes embodied in the modern constitutional doctrine of intergovernmental tax immunity," *Davis,* 489 U.S. at 813, 109 S.Ct. at 1506, prohibits only discrimination "because of the source of the pay or compensation." In Powers' view, since the federal government pays 99% of the compensation for personal service disbursed to North Carolina National Guardsmen, the Guardsmen must be considered to be federal employees for purposes of intergovernmental tax immunity. At a minimum, she claims, the law is not so clearly established that she is personally liable for collecting plaintiffs' taxes.

We need not actually rule on the constitutionality of the $1500 exemption to decide the issue before us. We have already held that prior to *Davis,* the doctrine of intergovernmental tax immunity would not have clearly prohibited such an exemption. Nor

---

**4.** The North Carolina General Assembly repealed the $1500 exemption effective January 1, 1990.

was it obvious following *Davis* that an exemption for the National Guard would be unconstitutional. Certainly if the Class B plaintiffs were not similarly situated to the National Guardsmen, then no violation occurred, but the record is barren of facts on that point. Even assuming that the two groups are similar, however, a reasonable state official could have concluded that the exemption was constitutional. The record shows that except when National Guardsmen are ordered into the service of the state in order to suppress riots or to provide disaster relief, they are compensated by the federal government pursuant to various federal statutes and regulations. Their paychecks are drawn on the United States Treasury. In 1989, state funds constituted only approximately one percent of the personal services compensation paid to National Guardsmen in North Carolina. The intergovernmental tax immunity doctrine prohibits discriminatory tax treatment of the federal government and those with whom it deals. Since the federal government pays both the Class B plaintiffs and the National Guardsmen, it is at least arguable that an exemption for one of those groups creates no constitutional violation. On that basis we hold, without deciding the constitutional merits of the claim, that Secretary Powers is entitled to immunity from the Class B plaintiffs' suit.

## V.

The ills that would result from allowing suits for damages against state officials who simply perform their official duties are evident. Suits such as these have the potential to threaten the foundations of our most basic governmental functions—in this case, the collection of the revenue. Because the plaintiffs' asserted rights were not clearly established and because Secretary Powers acted reasonably in enforcing presumptively valid state statutes, we hold that she is entitled to immunity from suit. The judgment of the district court is therefore

REVERSED.