998 F.2d 220
 62 USLW 2029, 8 IER Cases 991
 Donald Hobart AKERS, Jr.; William M. Cayton; Glen S.
Hanlin; Jimmy L. Richardson; Alvin Lee Engelke;
Larry Pauley, Plaintiffs-Appellees,
v.
Gaston CAPERTON, Governor, individually and in his official
capacity as Governor of the State of West Virginia; Art
Gleason, individually and in his official capacity as
Secretary of the Department of Transportation, Defendants-Appellants,
and
Kenneth M. Dunn, individually and in his capacity as
Secretary of the Department of Transportation, Defendant.
 No. 92-2157.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 1, 1993.
Decided June 29, 1993.
 
 Jon L. Brown, argued (Charles R. Bailey, on brief), Shuman, Annand & Poe, Charleston, WV, for defendants-appellants.
 William C. Garrett, Gassaway, WV, argued (Clinton W. Smith, Charleston, WV, on brief), for plaintiffs-appellees.
 Before HALL, Circuit Judge, BUTZNER, Senior Circuit Judge, and VOORHEES, Chief United States District Judge for the Western District of North Carolina, sitting by designation.
 OPINION
 K.K. HALL, Circuit Judge:
 
 
 1
 The plaintiffs, former West Virginia County Maintenance Superintendents transferred because of their political affiliation, filed this 42 U.S.C. § 1983 suit seeking damages and equitable relief. The district court granted the plaintiffs' motion for summary judgment on liability, denied the defendants' defense of qualified immunity, and set the case for trial to determine damages. The defendants appealed.
 
 
 2
 We affirm the district court's ruling that the plaintiffs' transfers pursuant to W.Va.Code § 29-6-4(d) violated their civil rights, we reverse the district court's ruling that the defendants forfeited their qualified immunity from suits for money damages, and we remand the case for further proceedings on the plaintiffs' equitable claims.
 
 
 3
 * This case stems from the 1988 West Virginia gubernatorial election in which the Democratic challenger, Gaston Caperton, defeated the Republican incumbent, Arch Moore.
 
 
 4
 In recent years, the Governor's discretion to hire and fire public employees for political reasons has been greatly circumscribed by state civil service laws, see W.Va.Code § 29-6-1 et seq., and United States Supreme Court decisions holding that low-level public employees have a First Amendment right to be free from adverse employment decisions based upon political affiliation. See Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); Rutan v. Republican Party of Illinois, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Given the long history of political patronage in state and federal politics, see Susan L. Martin, A Decade of Branti Decisions: A Government Official's Guide to Patronage Dismissals, 39 Am.U.L.Rev. 1, 13-16 (1989) [hereinafter, Martin, A Decade of Branti ], it is perhaps unsurprising that state elected officials have occasionally attempted to buck these constraints by continuing to make employment decisions based upon political affiliation. It is equally unsurprising that such practices have frequently led to protracted constitutional litigation.[1]
 
 
 5
 Perhaps as an inaugural present for the new Democratic governor, the Democratically controlled West Virginia Legislature amended § 29-6-4(d) to broaden the group of employees exempt from civil service protection. As amended, the statute reads:
 
 
 6
 The Legislature finds that the holding of political beliefs and party commitments consistent or compatible with those of the governor contributes in an essential way to the effective performance of and is an appropriate requirement for occupying certain offices or positions in state government, such as the secretaries of departments and the employees within their offices, the heads of agencies appointed by the governor and, for each such head of agency, a private secretary and one principal assistant or deputy, all employees of the office of the governor including all employees assigned to the executive mansion, as well as any persons appointed by the governor to fill policymaking positions and county road supervisors or their successors, in that such offices or positions are confidential in character and/or require their holders to act as advisors to the governor or his appointees, to formulate and implement the policies and goals of the governor or his appointees, or to help the governor or his appointees communicate with and explain their policies and views to the public, the Legislature and the press.
 
 
 7
 W.Va.Code § 29-6-4(d).
 
 
 8
 The amendment went into effect on July 1, 1989. On July 20, 1989, Governor Caperton's Secretary of Transportation, Kenneth Dunn, notified all County Maintenance Superintendents ("Superintendents") that they had the option of voluntarily transferring to positions as Area Maintenance Managers or remaining in their Superintendent positions pending a final decision on their status.[2] None of the Superintendents accepted Dunn's offer, and, in October 1989, all Superintendents were involuntarily transferred to the position of Area Maintenance Manager. The defendants stipulate that the transfers were politically motivated.
 
 
 9
 Six of the Superintendents then filed this suit under 42 U.S.C. § 1983 against Governor Caperton, Secretary of Transportation Dunn, and Dunn's replacement, Arthur L. Gleason.[3] The suit sought reinstatement as well as damages from the defendants in their individual and official capacities.
 
 
 10
 The parties filed cross-motions for summary judgment. The district court dismissed the claims against Dunn, because he had not been timely served, and the claims for money damages against Caperton and Gleason in their official capacities, as barred by Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (suit against state official in his official capacity is a suit against the state; state is not a "person" within the meaning of § 1983). However, the district court ruled that the transfers violated the plaintiffs' First Amendment rights and that Caperton and Gleason were not entitled to assert qualified immunity from personal liability for money damages. The case was set for trial on the issues of damages and potential injunctive relief. The defendants then filed this interlocutory appeal.
 
 II
 
 11
 (Scope of review)
 
 
 12
 Our initial task is to determine what questions are properly before us in this appeal.
 
 
 13
 The district court's disposition of the parties' summary judgment motions did not adjudicate "all the claims and the rights and liabilities of all the parties," Fed.R.Civ.P. 54(b), and, therefore, was not a final judgment within the meaning of 28 U.S.C. § 1291. However, in Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985), the Supreme Court held that a denial of qualified immunity, although not a final order, is immediately appealable. Thus, Mitchell establishes our jurisdiction to review the district court's qualified immunity ruling. The tougher issue is whether we may also review the district court's ruling on the underlying constitutional claim, and, if so, whether it is prudent to do so. See O'Bar v. Pinion, 953 F.2d 74, 79-80 (4th Cir.1991).
 
 
 14
 Under the doctrine of pendent appellate jurisdiction, an appellate court with jurisdiction over one issue in a case, may consider other, not independently appealable issues, if the issues substantially overlap and "review will advance the litigation or avoid further appeals." Id. at 80. Although pendent appellate jurisdiction must be exercised cautiously, it is frequently appropriate on review of a denial of qualified immunity, because, unless the complaint establishes a violation of clearly established law of which a reasonable person would have known, the defendants are entitled to a dismissal of the federal claims. See Id. ("[A] core issue in resolving the immunity defense is whether state officials violated clearly established legal norms.... Thus, the availability of qualified immunity overlaps substantially the question on the merits of the constitutional claims.") (citations omitted).
 
 
 15
 The merits of the underlying constitutional claim have been raised by the parties, fully briefed, and argued to this Court. The constitutional claim is substantially related to the immunities issue and its resolution will advance this litigation. Therefore, we exercise pendent appellate jurisdiction and address the district court's ruling on the merits of the plaintiffs' constitutional claim.
 
 III
 
 16
 (First Amendment analysis )
 
 
 17
 A. The relationship between the First Amendment and politically motivated decisions affecting government employees.
 
 
 18
 The broad outlines of this area of the law are established, and we shall not dwell on them. For two centuries the law concerning political patronage could be stated in the brief phrase: "To the victor belong the spoils." The exercise of political patronage was not only legal, it was expected. See Martin, A Decade of Branti at 14-15.
 
 
 19
 Of course, this practice has been severely restricted. In Elrod, 427 U.S. 347, 96 S.Ct. 2673, the Supreme Court held that patronage dismissals of non-policymaking officials violated the First Amendment. In Branti, 445 U.S. at 518, 100 S.Ct. at 1294, the Court restated its test, holding that the First Amendment barred patronage dismissals unless "party affiliation is an appropriate requirement for the effective performance of the public office involved." In Rutan, 497 U.S. 62, 110 S.Ct. 2729, the Court held that the First Amendment also barred politically motivated employment decisions less severe than outright dismissal, including promotions, transfers, and the decision to recall or rehire. Thus, the law is now restated: "To the victor belong only those spoils that may be constitutionally obtained." Id. at 63, 110 S.Ct. at 2731 (citations omitted).
 
 
 20
 B. W.Va.Code § 29-6-4(d)'s constitutionality.
 
 
 21
 We review summary judgments de novo and, like the district court, must consider the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).
 
 
 22
 In order to decide whether party affiliation is an appropriate requirement for the performance of a Superintendent's duties, we must first determine what a Superintendent does. According to DOH's written job description in effect at the time of the plaintiffs' transfers,[4] a Superintendent (a) plans and directs routine maintenance (which must be conducted according to Department and District policies and procedures), (b) executes instructions from his superiors, (c) prepares records and reports, (d) inspects roads and bridges, (e) keeps supervisors informed of road conditions, and (f) requests technical assistance if needed. The defendants allege, and for purposes of summary judgment we must accept as true, that the position entails the additional functions of receiving and handling citizens' complaints; setting priorities for work; maintaining a relationship with federal, state, and local agencies; and advising superiors on the proper course of action for certain employment and budget decisions. We note that these duties are "limited [with] well-defined objectives." Elrod, 427 U.S. at 368, 96 S.Ct. at 2687.
 
 
 23
 Turning to the DOH's organizational chart, we learn that the Superintendent is seven rungs below the Governor on the chain of command.[5] Although there is no talismanic "level" at which Elrod protection per se applies, generally, the higher an employee is in the pecking order, the less First Amendment protection he or she receives. See Rutan, 497 U.S. at 74, 110 S.Ct. at 2737 ("A government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views.") (citations omitted) (emphasis supplied). Clearly, a Superintendent is not a "high-level" employee. More importantly, the two positions immediately above the Superintendent (District Engineer and District Maintenance Assistant) in the Department's chain of command are both civil service positions. It is hard to imagine how political affiliation could be an appropriate requirement for a Superintendent, when it is evidently not a requirement for his or her immediate superiors.
 
 
 24
 The defendants argue that the Superintendent is a "policymaker," a "confidant," and a "communicator."[6] Of course, in a very limited sense of the term, a Superintendent makes policy. However, the Branti inquiry is one of degree, and the low-level policymaking authority accorded a Superintendent does not outweigh the employee's First Amendment rights of political affiliation. Similarly, though a Superintendent is frequently in contact with the public, this contact alone does not make an employee a "communicator" within the meaning of Elrod --a telephone operator, a tour guide at the State Capitol, and a bus driver are all in constant contact with the public--however, no one would seriously argue that these positions are outside Elrod and Branti 's protection.
 
 
 25
 As Branti explains, "the ultimate inquiry is ... whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1294; see also Stott, 916 F.2d at 142 (party affiliation is an appropriate litmus test only "when there is a rational connection between shared ideology and job performance."). We conclude that there is no rational connection between shared ideology and the performance of this low-level job.[7] To paraphrase the court in Abraham v. Pekarski, 537 F.Supp. 858, 865 (E.D.Pa.1982), aff'd in part and rev'd in part, 728 F.2d 167 (3d Cir.), cert. denied, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984), "[L]ittle persuasive force attends a contention that [deciding which pothole should be filled first] requires a certain political affiliation in order to be effectively performed."
 
 
 26
 Therefore, we agree with the two courts that have previously addressed this question and hold that § 29-6-4(d) is unconstitutional as applied to the position of County Maintenance Superintendent. See Akers v. Caperton, 797 F.Supp. 514 (S.D.W.Va.1992); Akers v. West Virginia Dept. of Highways, 425 S.E.2d 840 (W.Va.1992).
 
 IV
 
 27
 (Qualified immunity )
 
 
 28
 The doctrine of qualified immunity attempts to reconcile two potentially conflicting principles: the need to deter government officials from violating an individual's federal civil rights and the need for government officials to act decisively without undue fear of judicial second guessing. See Swanson v. Powers, 937 F.2d 965, 967 (4th Cir.1991) (qualified immunity "reflects the concern that civil damage awards against public officers for every judicially determined violation of constitutional rights would prove too expensive to the public, discourage public service employment and impair governmental decision-making.") (internal quotations omitted), cert. denied, --- U.S. ----, 112 S.Ct. 871, 116 L.Ed.2d 777 (1992); Mitchell v. Rice, 954 F.2d 187, 191 (4th Cir.1992) ("In the interests of accomplishing public goals and encouraging public service, government officials should not be under the burden of defending themselves against every claim raised by an aggrieved individual, but neither should they be given free rein and the power of a governing position to infract the rights of citizens."), cert. denied, --- U.S. ----, 113 S.Ct. 299, 121 L.Ed.2d 222 (1992). Often, the immunities issue is the critical question in a § 1983 federal civil rights suit, because the states (and state officers in their official capacities) are not "persons" within the meaning of § 1983 and thus may not be sued for money damages. Will, 491 U.S. 58, 109 S.Ct. 2304.
 
 
 29
 In Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court enunciated the standard for determining when an officer retains his or her qualified immunity:
 
 
 30
 [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
 
 
 31
 Thus, our job is to determine whether the defendants' conduct violated "clearly established" rights that existed at the time of the plaintiffs' transfers.
 
 
 32
 A. The district court's ruling.
 
 
 33
 The district court's ruling[8] was based upon two premises--that in 1989 the law was "clearly established" that politically motivated transfers of government employees violated the First Amendment, and that the defendants "sponsored" § 29-6-4(d).[9] Using an "unclean hands" analogy, the district court stated that the defendants' attempt to raise qualified immunity was inappropriate because:
 
 
 34
 Defendants cannot reap the benefit of qualified immunity based upon the shield of statute when it was their actions which accomplished the challenged amendment. A deliberate path was chosen by the Defendants to clothe themselves with immunity through the enactment of W.Va.Code, § 29-6-4(d).
 
 
 35
 Akers, 797 F.Supp. at 520. The September order reiterated that 29-6-4(d) was "a lame and transparent attempt to circumvent established First Amendment doctrine regarding patronage dismissals."
 
 
 36
 B. At the time of the plaintiffs' transfers, the defendants' actions did not violate "clearly established" law.
 
 
 37
 The error in the district court's analysis was its failure to correctly determine the clearly established law at the time of the plaintiffs' transfers. As we shall explain, in 1989, at least in this Circuit, there was a bifurcation in the law governing politically motivated dismissals and politically motivated transfers. When the defendants' actions are analyzed under then-prevailing law it is clear that they are entitled to immunity.
 
 
 38
 Although Elrod and Branti established that a government employee could not be dismissed on the basis of political affiliation, the doctrine's application to less severe adverse employment decisions, such as demotions, transfers, reassignments, or failures to promote, remained unclear.[10] In Delong v. United States, 621 F.2d 618 (4th Cir.1980), this Court extended Elrod to transfers and reassignments, but only when the adverse action had the practical effect of dismissal:
 
 
 39
 We believe that when [the principle of Elrod and Branti ] is applied to patronage practices other than dismissal it is rightly confined to those that can be determined to be the substantial equivalent of dismissal.
 
 
 40
 In applying the principle, so limited, to the actual or threatened reassignment or transfer of a government employee, the issue thus becomes whether the specific reassignment or transfer does in fact impose upon the employee such a Hobson's choice between resignation and surrender of protected rights as to be tantamount to outright dismissal.... It is obvious that not every reassignment or transfer can fairly be thought to have this quality. It is equally obvious that in practical terms some might.
 
 
 41
 Id. 621 F.2d at 623-24.
 
 
 42
 Delong received mixed reviews. Although the Seventh Circuit adopted our analysis, it was expressly rejected by the Third Circuit.[11] The Supreme Court chose to resolve the Circuit split and
 
 
 43
 granted certiorari ... to decide the important question whether the First Amendment's proscription of patronage dismissals recognized in [Elrod and Branti ] extends to promotion, transfer, recall, or hiring decisions involving public employment positions for which party affiliation is not an appropriate requirement.
 
 
 44
 Rutan, 497 U.S. at 66-68, 110 S.Ct. at 2733-34 (emphasis supplied). The Court, in a 5-4 decision, announced on June 21, 1990, that Elrod and Branti apply to all transfers and reassignments, including those that are not "tantamount" to an outright dismissal.
 
 
 45
 To hold a government official "liable because she failed to accurately predict the outcome [of a future court decision] would work a miscarriage of justice," Swanson v. Powers, 937 F.2d at 967, and, under the Harlow test, the critical inquiry is the state of the law at the time of the official's actions, not the result reached after years of judicial pondering. Harlow, 457 U.S. at 818, 102 S.Ct. at 2738; McConnell v. Adams, 829 F.2d 1319, 1324-26 (4th Cir.1987); Swanson, 937 F.2d at 967-71. In October 1989, when the defendants ordered the plaintiffs' transfers, Delong 's "tantamount to dismissal" test was the law in this Circuit. See Jones v. Dodson, 727 F.2d 1329, 1334 n. 5 (4th Cir.1984); Pierson v. Gondles, 693 F.Supp. 408, 414 n. 15 (E.D.Va.1988); Stott v. Martin, 725 F.Supp. 1365, 1382-83 (E.D.N.C.1989), rev'd, Stott v. Haworth, 916 F.2d 134 (4th Cir.1990). Therefore, despite Rutan 's ultimate rejection of Delong, the defendants retain their qualified immunity unless the transfers were tantamount to a dismissal.
 
 
 46
 Although the tantamount to dismissal inquiry may sometimes involve a dispute of material fact inappropriate for summary judgment, it does not here. The salaries for the two positions were precisely the same. None of the Superintendents resigned--they all continued to work for the DOH as Area Maintenance Managers in the same counties in which they had been stationed as Superintendents. Thus, we conclude as a matter of law that the plaintiffs were not faced with a Hobson's choice between resignation or reassignment. Because the defendants' actions did not violate "clearly established" law at the time of the transfers--and did, in fact, comply with this Circuit's established law--the district court's qualified immunity ruling must be reversed.
 
 V
 
 47
 (Disposition)
 
 
 48
 For the aforementioned reasons the district court's rulings are affirmed in part and reversed in part. We remand the case to the district court to address the plaintiffs' claims for injunctive relief.[12] In light of the West Virginia Supreme Court's decision in Akers v. West Virginia Dept. of Highways, 425 S.E.2d at 840 (finding § 29-6-4(d) unconstitutional as applied to the Superintendent position and ordering Akers' reinstatement), the district court should ascertain the status of any related litigation before considering the plaintiffs' remaining claims.
 
 
 49
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.
 
 
 
 [1]
 See by way of example England v. Rockefeller, 739 F.2d 140 (4th Cir.1984) (Branti suits brought by former employees of the West Virginia DOH who were allegedly terminated because of their political affiliation), abrogated by Young v. Lynch, 846 F.2d 960 (4th Cir.1988); Bever v. Gilbertson, 724 F.2d 1083 (4th Cir.1984) (same), abrogated by Young v. Lynch, 846 F.2d 960 (4th Cir.1988); see also Barton v. Manchin, 686 F.Supp. 139 (S.D.W.Va.1988) (same--employees of the State Treasurer's Office)
 
 
 [2]
 All of the Superintendents were Republicans hired by the previous governor--a Republican
 
 
 [3]
 Gleason replaced Dunn as Secretary of Transportation in February 1990
 
 
 [4]
 02.08.02 County Maintenance Superintendent
 [Each County is under the direction of a Superintendent, who is responsible to the District Engineer and directly under the supervision of the District Maintenance Engineer organizationally.]
 The [Superintendent] is responsible for the state force maintenance work in a County except for work assigned to special crews. The [Superintendent] is assigned the responsibility and authority to plan and direct all County routine maintenance operations. Plans are based on the established procedures and policies of the Department and the District. The [Superintendent] will carry out all instructions received from the District Headquarters and will see that all reports and records required by the District Engineer are prepared in a timely and proper manner.
 The [Superintendent] must know conditions in the County thoroughly by constant inspections of all roads and bridges within its boundaries. The [Superintendent] will keep the supervisors informed of conditions in the County and if any technical assistance is needed, it shall be requested from [District Maintenance].
 
 
 [5]
 The Division of Highways' organizational chart establishes the following chain of command: Governor, Secretary of Transportation, Commissioner of Highways, Assistant Commissioner of Highways, various department heads, District Engineer, District Maintenance Assistant, and County Maintenance Superintendent
 
 
 [6]
 Courts continue to use Elrod 's original "policymaker/confidant" inquiry, as an aid to determining whether party affiliation is an appropriate requirement. See Stott v. Haworth, 916 F.2d 134, 142 (4th Cir.1990)
 
 
 [7]
 An additional factor present in this case is the West Virginia Legislature's determination that political affiliation is an important requirement for the Superintendent position. See W.Va.Code § 29-6-4(d). Although legislative findings are given deference, "[t]he matter is a question of law to be ultimately decided by the courts." Stott, 916 F.2d at 142-43 (citation omitted)
 
 
 [8]
 The district court's July 30, 1992, Order, see Akers v. Caperton, 797 F.Supp. at 514, was supplemented by a second Order entered on September 4, 1992. Because the final order incorporates the earlier order's reasoning, we discuss both
 
 
 [9]
 For example, the district court's September 4, 1992, Final Order stated:
 The legislative history leading to the enactment of W.Va.Code, § 29-6-4(d) has been extensively briefed by Defendants. It is clear that the offensive language inserted into the statute was done by the Senate Judiciary Committee for the 1989 West Virginia Legislature. The chairman on the Judiciary Committee was Lloyd G. Jackson, Governor Gaston Caperton's campaign manager in the 1988 election. Defendants claim that it was not Jackson who added the offensive language but a subcommittee of the Senate Judiciary Committee, of which Jackson was not a member. The Court recognizes this difference but notes that it is a difference without distinction. The offensive language was added by the Senate Judiciary Committee which Jackson chaired.
 
 
 [10]
 Notably, in Elrod, both the plurality opinion and Justice Stewart's concurrence limited the Court's decision to outright dismissals. Elrod, 427 U.S. at 353, 375, 96 S.Ct. at 2679, 2690. Branti drew the same distinction. Branti, 445 U.S. at 513 n. 7, 100 S.Ct. at 1292 n. 7
 
 
 [11]
 See Rutan v. Republican Party of Illinois, 868 F.2d 943, 951 (7th Cir.1989) (en banc ) (discusses Circuit split and adopts Delong 's "substantial equivalent to a dismissal" test), aff'd in part and rev'd in part, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); Bennis v. Gable, 823 F.2d 723, 731 n. 9 (3d Cir.1987) (expressly rejects Delong and applies Elrod- Branti to all adverse employment actions)
 
 
 [12]
 Akers' injunctive claim has been mooted by his death