**Peggy S. McCREREY, Plaintiff,**

v.

**Ray ALLEN, Jr., et al., Defendants.**

**Civil Action No. 3:95cv497.**

United States District Court,
E.D. Virginia, ·
Richmond Division.

May 23, 1996.

Gerald T. Zerkin, Robert Godfrey, Melanie A. Hopper, Gerald T. Zerkin and Associates, Richmond, Virginia, for Plaintiff.

James S. Gilmore, III, Catherine C. Hammond, Guy W. Horsley, Jr., Office of the

Attorney General, Richmond, Virginia, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

Peggy S. McCrerey initiated this action under 42 U.S.C. § 1983 and Title VII, 42 U.S.C. § 2000, *et seq.*, against the Commonwealth of Virginia, its Department of Professional and Occupational Regulation ("DPOR"), and Ray Allen, the Director of DPOR. The Complaint alleged that McCrerey had been discharged from one position and had not been interviewed for another because she was a woman. The defendants moved for summary judgment, and McCrerey sought leave to amend the Complaint to allege that the decision to terminate her employment, and the decision not to interview her for a new position, were both made on the basis of her political affiliation, or lack thereof. McCrerey also sought leave to add Jack Kotvas, the former Deputy Director of DPOR and its current Acting Director, as a defendant. Leave to amend was granted and McCrerey filed an Amended Complaint naming only Allen and Kotvas, individually, as defendants.

The Amended Complaint asserts claims against Allen and Kotvas under 42 U.S.C. § 1983 for violating McCrerey's rights under the First and Fourteenth Amendments because they took employment actions adverse to her solely on the basis of her political affiliation, or lack thereof. For that same reason, McCrerey charges that Allen and Kotvas violated 42 U.S.C. § 1985(3) by conspiring to violate her First and Fourteenth Amendment rights. There is no longer a charge of gender discrimination.

After the Amended Complaint was filed, Allen left state employment. Following completion of discovery, Allen and Kotvas moved for summary judgment.

## STATEMENT OF FACTS

### A. The Deputy Administrator Position

On July 26, 1994, McCrerey was terminated from employment as DPOR's Administrator for Regulatory Programs,[1] a position she had held for the last two and one-half years of her twenty-two year service as an employee of the Commonwealth. According to the record, construed in McCrerey's favor, that event occurred in the following context.

For years, the Commonwealth has regulated the conduct of numerous professions and occupations through the activities of eighteen regulatory boards, the members of which are appointed by the Governor of Virginia. Although the actual regulatory authority rests with the boards, DPOR sets regulatory policy, administers regulations established by the boards, provides the boards with staff support, and serves as the administration's liaison with the boards and with the General Assembly. Thus, DPOR plays a central role in the establishment and implementation of the state policy respecting the regulation of professions and occupations.

Under the state employment system, each employee completes a "Position Description" which is then approved by the employee's supervisor. The Position Description which McCrerey prepared for Deputy Administrator for Regulatory Programs defines the chief objectives of the position as follows:

> Manages agency program by providing administrative support to regulatory [sic] supported by the department. Provides leadership, training and guidance to regulatory boards' staff members. Assists administrators in identifying problems and solutions. Coordinates with support activities to assure effective support for board operations. *Serves as a member of the Department's senior management staff whose role is to address policy issues affecting the entire agency. This position functions as one of three deputies managing large agency divisions.*

(Vaeth Affidavit, January 11, 1996, Ex. 1, PART II, ¶ 11 (emphasis added)).

The Position Description also contains the employee's description (again with the super-

---

1. McCrerey's pleadings refer to the position she held in July 1994 as Deputy Director of DPOR, whereas the position description actually entitles the position as Deputy Administrator of DPOR for Regulatory Programs.

visor's approval) of the tasks and duties to be performed by the holder of the position and states the percentage of time spent on each duty starting with the most important duty and concluding with the least important one. According to this section of the Position Description, as completed by McCrerey, the working time of the Deputy Administrator for Regulatory Programs is apportioned as follows:

- 30% is devoted to managing the Regulatory Programs Division;
- 20% is devoted to managing DPOR's senior staff and meeting weekly to discuss issues affecting DPOR including policy development and the budget;
- 15% is devoted to working with the Regulatory Programs Division staff to ensure that policies are responsive and accurate;
- 15% is devoted to developing, monitoring, and evaluating policies and procedures relating to board activities;
- 10% involves oversight of the promulgation, review, and revision of regulations for all of the board to ensure that the regulations are in compliance with the applicable statutes and "to maximize the clarity and consistency of all regulations;" and
- 10% is devoted to coordinating legislative activities.

(*Id.* ¶ 12.)

The Position Description also reflects that the holder of the Deputy Administrator position is expected to exercise "independence and initiative" in "making critical decisions regarding the Regulatory Programs Division including decisions on non-routine issues and unusual matters for which no precedence has been set." According to the Position Description, the Deputy Administrator and the supervisor discuss "highly sensitive issues" and the position involves substantial communication with others outside the agency, including state and local elected officials, the Assistant Attorney General responsible for providing counsel to DPOR, and other state agencies. (*Id.* ¶¶ 13, 14.)

McCrerey's affidavit reinforces the significant role that the Deputy Administrator oc-cupies in the operation of DPOR. For example, her affidavit explains that, as Deputy Administrator, her responsibilities included the licensing and regulation of occupations and professions, management of the boards, coordinating legislative activities for the agency, and planning and implementing a customer service process. Although, McCrerey's affidavit says that she served as an "implementor of policy, not its creator," (McCrerey Affidavit, ¶ 3) at deposition, McCrerey described the Deputy Administrator position somewhat differently. Specifically, when McCrerey was asked why she considered herself to have been discharged for partisan political reasons, she responded that:

> The most powerful job [in] the agency outside of Ray's [Allen—the Director of DPOR] was the person who coordinated the boards. I was in that chair [as Deputy Administrator for Regulatory Programs], and Ray saw the boards as partisan in some of their decisions, and he wanted to put someone in that position who would more closely align politically with him.

(McCrerey Deposition at pp. 12–13.) In McCrerey's view, she was discharged so that Allen could give that "powerful job" to Kotvas.

According to McCrerey, the events which prompted her dismissal from the Deputy Administrator position began following the election of the new Republican Governor in November 1993. Specifically, McCrerey points to a letter dated December 9, 1993, which was sent to all at-will state employees, such as McCrerey, in which the Governor–Elect referred to her as "a high-level official of the Wilder [the then incumbent Democrat Governor] administration" and asked her and other "high-level appointees and employees of the current administration to offer their resignations, to become effective on January 15 [the date of his inauguration] or thereafter upon acceptance by the Governor." (Plaintiff's Exhibit 1.) That letter also invited such officials to reapply for the jobs they then held. That directive was countermanded by the then incumbent Governor, Douglas Wilder, and hence never took effect.

The new administration took over the Executive Branch of the state government in January 1994 and, in mid-April 1994, Allen assumed the position of Director of DPOR. Thereafter, Allen is alleged to have repeatedly referred to career state employees, including McCrerey, as "Wilder cronies" (McCrerey Affidavit ¶ 19) and to have stated that state employees were going to have "to pay" because Republicans had been kept out of the Governor's mansion for 12 years (Brown Affidavit ¶ 4.)

Also, in April 1994, Kotvas, who had worked with Allen in the 1993 gubernatorial campaign, and who was then not employed, was hired as a temporary employee in the Virginia Port Authority, a division of the Commerce Department. However, Kotvas worked only in DPOR (also a division of the Commerce Department) where he served as an advisor and assistant to Allen. The record reflects that both Allen and Kotvas intended that a permanent position would be found or created for Kotvas.

When Allen introduced Kotvas to the staff of DPOR in April 1994, he allegedly described Kotvas as his "eyes and ears" and then instructed that "anything that Jack asked, [the staff] were to provide, and anything that Jack said, carried the weight of Ray." Allen also is said to have described Kotvas as his "most trusted advisor" in the future as well as his "closest advisor from the [recently concluded gubernatorial] campaign."

When Allen took over as Director of DPOR, there were seven employees of DPOR who served at-will and were subject to termination without cause under the Virginia Personnel Act. As Allen's affidavit explains it:

Because it was my intent to seek a reduction of the regulatory burdens on businesses and individuals and to cut back spending by DPOR, I anticipated that I would probably reorganize DPOR and seek to streamline the agency. I anticipated terminating any of the at-will senior staff members who would not support and implement my vision for DPOR.

(Allen Affidavit, October 12, 1995, ¶ 3.) Not long thereafter, Allen determined that DPOR was "experiencing serious financial deficits, the source of which could be traced to two of the four divisions within DPOR." (*Id.* at ¶ 4.) One of those divisions was the Regulatory Programs Division headed by McCrerey. The other was the Information Systems Division headed by John Lynn. Allen ultimately fired both.

Soon after Kotvas began work, he and Allen set about planning the reorganization of DPOR. There is testimony in the record that, in May 1994, Allen, and perhaps even Kotvas, discussed with Robert Skunda, the cabinet secretary to whom Allen reported, the possibility of firing McCrerey. There is also testimony from Kotvas' secretary, Kristen Mavromatis, that, in May 1994, Kotvas knew that McCrerey's employment was to be terminated.

### B. The Chief Deputy Position

On July 1, 1994, as part of the reorganization of DPOR, Allen sought approval to create a new position entitled Chief Deputy Director ("Chief Deputy"). He received approval for the new position on August 1, 1994 to be effective as of that day. The Position Description for the Chief Deputy described the objective of the position as follows:

Position serves as the *chief executive* of the Agency [DPOR] *in the absence of the Director.* *Coordinates* comprehensive review of all *regulations* with 18 regulatory boards. Coordinates activities of the Regulatory Programs Division in providing support to the regulatory boards. *Coordinates* the *legislative package developed by the Agency.* Provides *legal consultation* to the Director. Coordinates activities of and provides general guidance to the Information Systems Division.

(Plaintiff's Exhibit 6, ¶ 11 (emphasis added)). The Position Description also reflects the time estimated to be devoted to each of the tasks and duties of the Deputy Chief position as follows:

● coordinating a comprehensive review of all board regulations and related tasks, 40%;

● coordinating activities of the Regulatory Programs Division in connection with li-

censing, professional examinations, investigations, and adjudicative activities, 20%;

- coordinating the Information Systems staff, 15%;
- working with staff to develop DPOR's legislative package, 10%; and
- serving as a member of the DPOR's Senior Management Team addressing issues such as long range planning, policy development, and revision of the departmental budget as well as providing legal counsel to the Director of DPOR (without replacing the Attorney General's office as legal advisor to DPOR), 15%.

(*Id.* ¶ 12.)

The holder of the Chief Deputy position also would be called upon regularly to communicate with the office of the cabinet secretary in charge of DPOR, the Attorney General, and elected officials respecting areas within the province of DPOR. (*Id.* ¶ 14.) Although the new Chief Deputy job included some duties previously performed by McCrerey as Deputy Administrator of the Regulatory Programs Division, it also included responsibilities beyond the scope of the position held by McCrerey.

### C. The Termination of McCrerey As Deputy Administrator And The Failure To Consider Her For The Chief Deputy Job

On July 11, 1994, Kotvas applied for the position of Chief Deputy. According to McCrerey, on July 14, she spoke with Allen about the announcement of the Chief Deputy position. In that conversation, Allen allegedly informed McCrerey that the new position would not result in a change of her job responsibilities. Thereafter, McCrerey applied for the Chief Deputy position.

The record does not reflect the total number of applicants for the Chief Deputy position, but Allen selected only two persons to be interviewed: Kotvas and Karl Schmidt, both of whom were lawyers. On July 25, Allen and Don Williams, the Director of the Department of General Services, conducted interviews for the Chief Deputy position.

On July 26, McCrerey was summoned to Allen's office where she met with Allen and Kotvas, and was told that her employment as Deputy Administrator was at an end. According to McCrerey, when she asked Allen whether she was being fired for performance reasons, he replied "no." Nor did the termination letter issued to McCrerey mention deficient performance as a reason for termination.

This evidence, of course, is at odds with Allen's affidavit which states that he terminated McCrerey's employment because "[f]rom my observations of Mrs. McCrerey's performance, and from talking with others, it became apparent to me that she was not acceptable to me as the administrative head of the Regulatory Programs Division." (Allen Affidavit, October 12, 1995, ¶ 5.) Stated more particularly, Allen's alleged reasons were:

(1) McCrerey did not provide reliable and straight-forward information to Allen and, therefore, she failed to meet his prerequisite for honest employees;

(2) McCrerey did not engage in a team approach as evidenced by the fact that she, contrary to Allen's instructions, repeatedly discussed issues of employee termination;

(3) McCrerey either was unable or unwilling to support Allen's aggressive deregulatory approach with the 18 Boards under the control of DPOR;

(4) McCrerey's section was one of two in DPOR which was running a financial deficit; and

(5) McCrerey did not devote herself fully to the job as evidenced by her departure every day at 5:00 p.m. and her failing to give extra effort to the job.

(Allen Affidavit at ¶ 6.)

Allen also contends that his termination of McCrerey came about as a result of his plans for reorganizing DPOR. A significant aspect of the plan, according to Allen, included establishing the Chief Deputy position, the holder of which would act as head of the agency and in Allen's absence and would have an important role in regulatory, budgetary, and legislative matters. Allen was

aware that the two previous Directors of DPOR had been lawyers. He, however, lacked a legal education and concluded that he needed a lawyer on the staff. Therefore, Allen decided to interview only those candidates who held a law degree for the Chief Deputy position. Allen contends that it was on that basis that he selected Kotvas and Karl Schmidt (both of whom held law degrees) to interview for the position. Allen asserts that he did not interview McCrerey because of the previously outlined performance problems and because she did not have what he considered to be a vital prerequisite, namely, a law degree.

On July 28, Allen announced that Kotvas had been hired as the Chief Deputy of DPOR. The letter announcing the selection stated that Kotvas, as Chief Deputy, would serve as the chief executive of the agency in the absence of Allen; would coordinate the Regulatory Programs Division, formerly headed by McCrerey, and the Information Systems Division, formerly headed by Lynn; and would coordinate the legislative package of DPOR, work with the Governor's Strike Force, and serve as legal counsel to Allen.

McCrerey, whose 1993 performance evaluation was categorized as "exceptional" (the highest rating given) has offered evidence which, if believed, would permit the finder of fact to reject each of the five grounds offered by Allen to support his conclusion that McCrerey's performance was deficient and to conclude that the sole motivation for McCrerey's termination was her political affiliation, or lack thereof.

First, McCrerey points to the request in December 1993 from the Governor–Elect which was distributed to all at-will state employees, including McCrerey, and requested that they tender their resignations and re-apply for their jobs. (Plaintiff's Exhibit 1 and McCrerey Affidavit at ¶ 12.) That letter refers to the at-will employees as "Wilder officials."

Second, McCrerey relies upon Allen's statements, made while he was the Director of DPOR, referring to career state employees as "Wilder cronies" and reflecting that state employees were going to have to pay for the fact that Republicans had been kept out of the Governor's mansion for 12 years. (McCrerey Affidavit at ¶ 20; Brown Affidavit at ¶ 4.)

Third, McCrerey emphasizes the partisan political background of both Allen and Kotvas and their roles in the 1993 gubernatorial campaign which produced the new Republican administration. In support of that assertion, McCrerey points out that Allen's professional experience was almost exclusively in partisan politics because he had worked extensively as a political consultant, always for Republicans or Republican organizations. (Allen Sept. Depo 7:16–19; Allen Jan. Depo. 22:14–18; 24:9–24.) She also emphasizes the fact that Allen's automobile license plate was "GOP HACK." (Allen Jan. Depo. 19:4–11.)

Fourth, McCrerey considers the timing of the decision to hire Kotvas to be a highly probative indicator of the defendants' political motivation. In that regard, the evidence is that, almost immediately after the new Republican administration was installed, Kotvas, who was then an unemployed former campaign official, was hired as a temporary employee at the Virginia Port Authority, but never actually worked there, reporting instead to the office of Secretary of Commerce and Trade, Robert Skunda, the cabinet secretary to which the DPOR is assigned.

Fifth, McCrerey's political motivation argument relies heavily on the assertion that Kotvas did not possess the requisite qualifications for the job of Chief Deputy. Based on Kotvas' resume and deposition, McCrerey asserts that Kotvas had no experience in government, no experience with regulations and no experience with managing anything. (Kotvas Sept. Depo. 7:16–19; 11:6–12:8; 12:20–13:5; 6:8–13; 9:17–10:2.) She argues that these deficiencies are especially conspicuous evidence of political motivation when they compared to her own qualifications.[2]

2. Kotvas' resume reflects that he has a bachelors degree in Business Administration and a MBA in Marketing and Human Resources as well as a law degree. It reflects that he worked in opera-

tions management for Montgomery Ward Company, as owner and general manager of Mac Tools, as a legal intern with the United States Senate, as a clinical intern with the Common-

Finally, McCrerey draws support for her political motivation argument from evidence that, during the interview for the Chief Deputy position, Allen commented on, and emphasized in his interview notes, the fact that Schmidt, who was the only candidate other than Kotvas, was "not a Democrat." (Plaintiff's Exhibit 11.)

For those reasons, McCrerey asserts that her termination as Deputy Administrator of DPOR and the decision to hire Kotvas as the Chief Deputy was solely the product of partisan political patronage from which Kotvas benefited because of his Republican affiliation and from which she suffered because she was not so affiliated. Allen and Kotvas deny that either the termination of McCrerey's employment as Deputy Administrator or the decision not to interview her for the position of Chief Deputy was motivated for political reasons. Rather, they insist that both decisions were made because of McCrerey's performance deficiencies and lack of qualifications.

## DISCUSSION

Resolution of the motion for summary judgment depends upon application of the, perhaps now misnomered, "policymaker" exception to the general prohibition imposed by the First Amendment upon governmental restrictions on the freedom of speech and association of public employees. It, therefore, is necessary to review that exception and the principles which control its application.

### I. The Controlling Principles

In *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Supreme Court held that political association alone could not constitute an adequate ground for denying public employment. In *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Supreme Court rejected the constitutionality of conditioning government benefits upon limitations of First Amendment rights. Those principles were the foundation of the decision in

wealth Attorney's Office for the City of Richmond, Virginia, as a judicial law clerk to the Circuit Court for the City of Richmond, as a director, founder and CEO of Comprehensive

*Elrod v. Burns,* 427 U.S. 347, 359, 96 S.Ct. 2673, 2682–83, 49 L.Ed.2d 547 (1976), where the Court held that: "[p]atronage practice falls squarely within the prohibitions of *Keyishian* and *Perry.*"

In *Elrod,* certain state employees were discharged or threatened with discharge solely because they were not affiliated with, or sponsored by, the Democratic Party, and the Court was confronted with the issue:

[W]hether public employees who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments.

*Elrod,* 427 U.S. at 349, 96 S.Ct. at 2678.

The Court, in *Elrod,* prefaced its examination of that constitutional question with a brief explication of the history of patronage practice in American politics. Having surveyed the history and general popularity of that time-honored practice, the Court observed that: (1) "[t]he cost of the practice of patronage is the restraint it places on freedoms of belief and association" *Elrod,* 427 U.S. at 355, 96 S.Ct. at 2680–81; and (2) "[i]t is not only belief and association which are restricted where political patronage is practiced. The free functioning of the electoral process also suffers." *Id.* at 356, 96 S.Ct. at 2681. As a consequence, the Supreme Court held that "[p]atronage ... to the extent it compels or restrains belief and association, is inimical to the process which undergirds our system of government and is 'at war with the deeper traditions of democracy embodied in the First Amendment.'" *Id.* at 357, 96 S.Ct. at 2682 (citations omitted). Nonetheless, the Court explained that the constitutional prohibition against encroachment on First Amendment rights is not an absolute one and, therefore, restraints on those rights are permitted for appropriate reasons. *Id.* at 360, 96 S.Ct. at 2683.

Legal Services, as an Assistant Professor of Law and Librarian at Regent University School of Law, and as regional field director of the George Allen For Governor Campaign.

However, the Court emphasized that any significant encroachment by the state upon a First Amendment right is subject to exacting scrutiny and will be permitted only where the state interest involved is one of vital importance. Moreover, the government carries the burden to establish the existence of an interest of that gravity and, in assessing the government's proof, the court must take care "not to confuse the interest of partisan organizations with governmental interests." *Id.* at 362, 96 S.Ct. at 2684. Simply put, the government must show that the patronage decision, *"further[s] some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights."* *Id.* at 363, 96 S.Ct. at 2685 (emphasis added).

Of the several governmental interests offered in *Elrod* to support political patronage terminations, the Court accepted only one: the need for political loyalty in certain public employees "to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Id.* at 367, 96 S.Ct. at 2687. The Court held that, by limiting patronage dismissals to "policymaking positions," the government's interest is accomplished because persons not in such positions usually were not in the position "to thwart the goals of the in-party." *Id.*

Upon the foregoing considerations, the Court in *Elrod* concluded:

> In summary, patronage dismissals severely restrict political belief and association. Though there is a vital need for governmental efficiency and effectiveness, such dismissals are on balance not the least restrictive means for fostering that end. There is also a need to ensure that policies which the electorate has sanctioned are effectively implemented. That interest can be fully satisfied by limiting patronage dismissals to policymaking positions.

*Id.* at 372, 96 S.Ct. at 2689.

Unfortunately, the opinion in *Elrod* provided little guidance concerning what duties and responsibilities attended "policymaking" and "non-policymaking" positions. Rather, *Elrod* made the general, and not particularly useful, observation that non-policymakers usually have "limited responsibility," whereas policymakers might have responsibilities that are not well-defined and that are broad in scope. *Id.* at 367–68, 96 S.Ct. at 2686–87. Other potentially significant guideposts were whether the employee acted as an advisor or formulated plans for the implementation of broad goals. *Id.* Thus, the lower courts were left to grapple with the intricacies of a complicated issue within a rather rudimentary framework.

Four years later in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court once again was called upon to review the constitutional strictures on patronage employment decisions. In *Branti,* the Court assessed the patronage dismissal of several assistant public defenders who were terminated in order to make room for associates of a public defender employed by the new party in power. The state argued that *Elrod* applied only if an employee were coerced by government officials into changing political allegiance. Rejecting that argument, the Court held that "[t]o prevail in this type of an action, it was sufficient, as *Elrod* holds, for respondents to prove that they were discharged 'solely for the reason that they were not affiliated with or sponsored by the Democratic party.'" *Branti,* 445 U.S. at 517, 100 S.Ct. at 1294.

The Court then explained that, in *Elrod,* it had recognized that party affiliation might be a constitutionally acceptable requirement for some types of government employment because "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Id.* (citing *Elrod,* 427 U.S. at 366, 96 S.Ct. at 2686.) Then, in a significant refinement of the foundation for *Elrod,* the Court observed that certain positions could be considered political in nature even though they were neither confidential nor policymaking in character and, conversely, that party affiliation would not necessarily be relevant to every policymaking or confi-

dential position. Having made those observations, the Court then articulated a shift in the focus of the inquiry prescribed by *Elrod* when it held that:

> In sum, *the ultimate inquiry* is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question *is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance* of the public *office* involved.

*Branti*, 445 U.S. at 518, 100 S.Ct. at 1295 (emphasis added).

The decision in *Branti* thereby reframed the ultimate inquiry the Court is to make by relegating the policymaking and confidential labels used in *Elrod* to mere factors which are relevant to, but not dispositive of, the ultimate inquiry. *Fuentes v. Torres Gaztambide*, 807 F.2d 236, 240 (1st Cir.1986). Mindful of the shift in emphasis established by *Branti* and having considered decisions of numerous courts of appeals and district courts in attempting to apply the *Elrod–Branti* doctrine, the First Circuit, in an *en banc* decision, based on six years of experience ensuing *Branti*, articulated in *Fuentes* a guideline for analysis of patronage employment decisions:

> From this review of the case law we draw the following propositions. The *fundamental one*, supporting the limited exemption from First Amendment protection against politically-motivated discharge, is that *representative government needs a certain amount of leeway for partisan selection of agents in order to work.* These agents may be made policymakers, confidential employees, or others for whom party affiliation is an equally 'appropriate' requirement. *Appropriateness* is, we think, a corollary to our system of *determining the direction of governmental entities by popular election of top office holders who have taken* or considered to have *taken positions* on one or more issues *during a campaign.* In order for the *new administration* to be given an opportunity to *fulfill expectations*, it *must have available and* also appear to have available *significant facilitators of policy*, people who have the *personal and partisan loyalty, initiative,*

and *enthusiasm* that can make the difference between the acclaimed success of a governmental agency or program and its failure or, more typically, its lackluster performance. The *presence of such persons advances the goals of representative* government; their *absence*, in *Elrod's* term, 'undercut[s]' such government.

*Fuentes*, 807 F.2d at 241 (citations omitted) (emphasis added).

The Fourth Circuit recognized *Branti's* impact in *Stott v. Haworth*, 916 F.2d 134 (4th Cir.1990), where, after outlining the decision in *Elrod*, the Court of Appeals observed that:

> In *Branti*, the Court *reformulated the policymaking/non-policymaking inquiry* mandated by *Elrod*. Instead of focusing on 'whether the label "policymaker" or "confidential" fits a particular person,' the Court held that 'the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.'

*Id.* at 140 (citations omitted) (emphasis added). Having then acknowledged the difficulty of determining whether political affiliation is a legitimate consideration in making public employment personnel decisions, the Fourth Circuit, relying substantially upon *Fuentes*, issued instructions respecting the inquiry which it considered necessitated by a complementary reading of *Elrod* and *Branti*. Under that analysis, the threshold inquiry for the district court is an examination:

> *whether the position* at issue no matter how policy-influencing or confidential it may be *relates to 'partisan political interests ... [or] concerns.'* That is, does the *position involve governmental decision-making on issues* where there is *room for political disagreement on goals* or their implementation? Otherwise stated, *do party goals or programs affect the direction, pace or quality of governance?*

*Stott*, 916 F.2d at 141–42 (emphasis added) (citations omitted). If that inquiry is answered affirmatively, the district court must proceed to examine the particular responsibilities of the position to determine whether it resembles: (i) a policymaker; (ii) a privy

to confidential information; (iii) a communicator; or (iv) some other officeholder whose function is such that party affiliation is an equally appropriate requirement. *Id.* at 142. This necessitates a focus on the powers inherent in the office, rather than on the duties or functions performed by a particular occupant of it. *Id.*[3] The Fourth Circuit also explained that "[a]lthough there is no talismanic 'level' at which *Elrod* protection per se applies, generally, the higher an employee is in the pecking order, the less First Amendment protection he or she receives." *Akers v. Caperton*, 998 F.2d 220, 225 (4th Cir.1993).

As our Court of Appeals observed in *Akers*, "[g]iven the long history of political patronage in state and federal politics, it is perhaps unsurprising that state elected officials have occasionally attempted to buck these constraints [*Elrod, Branti* and *Rutan*] by continuing to make employment decisions based upon political affiliation." *Akers*, 998 F.2d at 222. This is well-illustrated by the kinds of positions which those governments have sought to characterize as "policymakers" (between *Elrod* and *Branti*) and as requiring partisan political affiliation (after *Branti*). The decisions in *Stott* and *Fuentes* exhaustively catalog the kinds of positions which state and local governments have sought to bring within the reach of the *Elrod–Branti* doctrine. *Stott*, 916 F.2d at 144; *Fuentes*, 807 F.2d at 241. There is no need to repeat them here, but an examination of the listed decisions illustrates two critical points: first, state and local governments often have taken seemingly absurd positions in pursuit of patronage rights by arguing that low level, ministerial functionaries are within *Elrod–Branti;* second, elected government at every level legitimately needs, and is by law entitled to the benefit of, the kind of latitude in making patronage employment decisions permitted by the *Elrod–Branti* doctrine. The essence of *Stott* and

*Fuentes* reaffirm the touchstone provided by *Branti:* it is the burden of government claiming the right to patronage employment decisions to prove that "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Stott*, 916 F.2d at 140.

## II. Application Of The *Elrod–Branti* Doctrine

It is within the foregoing framework that the motion for summary judgment on McCrerey's claim must be assessed. And, at this stage of the proceedings, McCrerey is entitled to all favorable inferences which may be drawn from the exhibits, affidavits, depositions, and pleadings proffered by McCrerey.

### A. The Standard For Summary Judgment

Summary judgment is to be rendered "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The rules further provide:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

It is the responsibility of the party seeking summary judgment to inform the court of the

---

**3.** In 1990, the Supreme Court applied the *Elrod–Branti* doctrine to non-termination (hiring, promotion, transfer, or recall after layoff) employment decisions involving public employees. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). *Rutan* involved what the Court referred to as "low-level public employees: a rehabilitation counselor, a prison guard, a state garage worker, a dietary

manager and a road equipment operator," each of whom represented one of the non-termination decisions there at issue. *Rutan* made it clear that "conditioning *hiring* decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so." *Rutan*, 497 U.S. at 78, 110 S.Ct. at 2739 (emphasis added).

basis for its motion, and to identify the parts of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 216 (4th Cir.1987). "[W]here the non-moving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories and admissions on file.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The moving party may also use affidavits to support its motion. Then the non-moving party must go beyond the pleadings and, by citing its own affidavits or by citing "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* Opposition to a properly documented summary judgment motion may not be based solely on the pleadings. *Id.*

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis added). It is the function of the district court not to weigh the evidence, but to determine whether there is a genuine issue for trial, and "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511 (citations omitted). Hence, summary judgment is appropriate if the evidence is "merely colorable" or "not significantly probative." *Id.* at p. 249, 106 S.Ct. at 2511 (citations omitted). The standard for summary judgment mirrors the standard for directed verdict (now judgment as a matter of law) under Fed.R.Civ.Pro. 50(a), the principal difference being procedural. *Id.* at 251, 106 S.Ct. at 2511–12. And, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). The non-moving party, however, "need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514. The district court also "must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513.

Furthermore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. Summary judgment is appropriate only if, upon consideration of the record as a whole, a reasonable trier of fact could not find for the non-movant. *Allstate Fin. Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir.1991). But, where a faithful examination of the record establishes the absence of a genuine issue of material fact, it is "the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987); *see also Guinness PLC v. Ward*, 955 F.2d 875, 883 (4th Cir.1992). With these principles in mind, the court will consider the motions for summary judgment filed by the defendants.

## B. Application Of *Elrod–Branti* To The Motion For Summary Judgment

This action, of course, presents a rather unique circumstance for application of the *Elrod–Branti* doctrine because the governmental defendants deny that the termination of McCrerey as Deputy Administrator and the failure to hire her as Chief Deputy were patronage decisions. Hence, there is no direct evidence that either employment decision was made for that reason. However, McCrerey has presented circumstantial evidence from which the finder of fact could infer that both challenged personnel decisions were taken as a consequence of McCrerey's lack of Republican affiliation and Allen's desire to place Kotvas in the Chief Deputy job because Kotvas was affiliated with the Republican party and the new Republican administration. Moreover, even Al-

len admits that one reason for the employment decisions was that McCrerey did not enthusiastically support his approach to running DPOR. Therefore, it is necessary to assess the patronage employment issue as raised by McCrerey, notwithstanding the contentions of the defendants that the challenged employment decisions were not made for that reason, but instead were made because McCrerey's performance was unsatisfactory.

■ In accordance with the principles discussed earlier, the court must first examine the duties attending the positions which are indicative of whether they are or are not subject to patronage considerations. The position of Deputy Administrator was one level below the Director of DPOR and its occupant was charged with management of one of the five divisions of DPOR, the Regulatory Programs Division. The Deputy Administrator served "as a member of the Department's senior management staff whose role is to address policy issues affecting the entire agency." The occupant of the position devoted 20% of the time to that task and 15% of the time to the task of "developing, monitoring and evaluating policies and procedures relating to board activities." The holder of the Deputy Administrator position made decisions on non-routine and unusual matters, was required to consult on "highly sensitive issues, and to communicate with board members, state agencies and DPOR's legal advisors." McCrerey herself described her position in DPOR as second in power only to the Director.

The Chief Deputy's position is even more powerful than the Deputy Administrator position because its occupant is to serve as the agency's chief executive in the absence of the Director. And, the holder of the position coordinates DPOR's entire legislative package, as well as serves on the senior management team charged with establishing and implementing policy and the agency's budget.

Considering the nature of each position and taking into account that the new administration campaigned in significant part on promises to reduce both the cost of government and the intrusiveness of government regulation, there is little doubt that party

affiliation would be an "appropriate requirement for effective performance of" the offices of Deputy Administrator and Chief Deputy, respectively, of DPOR. Clearly, the creation and implementation of regulatory policy which impacts the conduct of professions and occupations involves issues on which there is room for political disagreement on goals and their implementation. Those party goals, which were a central part of the gubernatorial campaign, affect the direction, pace, and quality of government. Thus, each position satisfies the threshold inquiry prescribed by *Stott.*

■ The record also shows with equal clarity that both positions require that their holders be: (i) policymakers; (ii) privies to confidential information; and (iii) communicators for DPOR and the administration. Thus, the second inquiry under *Stott* also warrants a finding that the positions are subject to political patronage. For those reasons, the defendants have made an initial showing that a decision to terminate employment or not to hire, as to either position, falls within the *Elrod–Branti* doctrine as applied under the law in this circuit in *Stott.*

■ McCrerey argues, in response to this initial showing by the defendants, that they are not entitled to the exception provided by the *Elrod–Branti* doctrine because state law and executive policy insulate both the Deputy Administrator and Chief Deputy positions from political patronage employment decisions. Resolution of this issue necessitates a brief overview of the statutory scheme governing the Virginia personnel system. Before reaching that question, however, the court must also consider McCrerey's alternative argument, namely, her assertion that the *Elrod–Branti* doctrine has no applicability because the defendants themselves do not even argue that partisan political affiliation is a requirement for either the Deputy Administrator or the Chief Deputy position.

■ McCrerey's contention that the defendants cannot invoke the *Elrod–Branti* doctrine is undercut by her construction of the evidence which calls the *Elrod–Branti* doctrine into play here. Moreover, McCrerey's view of the record is persuasive because a

finder of fact could conclude from the circumstantial evidence that both employment decisions were motivated by partisan political considerations. If McCrerey is right in her contention that partisan political affiliation, or the lack of it, motivated the challenged employment decisions, then the defendants are entitled to assert in their defense that, even though they did not do so, they could have based those decisions on such considerations. Thus, on this point McCrerey's argument proves too much. That being so, the court must reach McCrerey's other argument: that the state law classifications of her position as not being subject to political considerations affords her federal constitutional protection.

As explained above, McCrerey, as Deputy Administrator, was an at-will employee who, by virtue of Virginia law, was exempt from the requirements of the VPA because she reported directly to the agency head. Va. Code Ann. § 2.1–116(16). Notwithstanding that the Deputy Administrator position is classified as exempt, Virginia law provides that "personnel actions *shall be taken* without regard to race, sex, color, national origin, religion, age, handicap or *political affiliation.*" Va.Code Ann. § 2.1–116(16) (emphasis added). Likewise, Virginia law provides that for employment decisions concerning the Chief Deputy position "[r]ecruitment and selection of individuals covered by exemption shall be handled in a manner consistent with policies applicable to classified position." Va. Code Ann. § 2.1–116(16). And, hiring for classified positions may not be filled on the basis of political affiliation. Va.Code § 2.1–116(16); 2.1–116(10). Thus, under Virginia

personnel law, political considerations are not to play a role in the termination of the Deputy Administrator position or the filling of the Chief Deputy position.[4]

As McCrerey points out, these limitations also manifest themselves in Executive Memorandum 9–94 which requires hiring for nonexempt positions under the VPA to be in accord with the knowledge, skill and abilities requirements of state personnel policies. (Plaintiff's Exhibit 2.) Likewise, a memorandum sent on August 16, 1995, which postdated the employment actions here at issue, from the Governor's Chief of Staff stated: "Political appointments extend as far as the agency director, and no more."[5]

■ On the strength of the foregoing Virginia statutes and statements of policy, McCrerey asserts that the defendants cannot claim the protection of the *Elrod–Branti* doctrine because state law and policy explicitly forbids employment decisions to be made on the basis of political affiliation for the positions at issue. Although neither state policy nor state law defining a position as requiring—or not requiring—partisan political affiliation controls the *Elrod–Branti* analysis, it is a factor to consider in assessing whether a position is within the protective ambit of the doctrine. *Stott v. Haworth,* 916 F.2d 134, 142 (4th Cir.1990); *Kaluczky v. City of White Plains,* 57 F.3d 202, 209 (2d Cir.1995); *Shakman v. Democratic Org. of Cook County,* 722 F.2d 1307, 1310 (7th Cir.1983); *Committee to Protect the First Amendment v. Bergland,* 626 F.2d 875 (D.C.Cir.1979); *Rouse v. Nielsen,* 851 F.Supp. 717, 728 (D.S.C.1994).[6]

---

**4.** This was amended in 1995 by § 2.1–116(19) which provides:

> In executive branch agencies the employee who has accepted serving in the capacity of chief deputy, or equivalent, and the employee who has accepted serving in the capacity of a confidential assistant for policy or administration. An employee serving in either one of these two positions, shall be deemed to serve on an employment at will basis. An agency may not exceed two employees who serve in this exempt capacity.

**5.** McCrerey asserts that Allen testified that Kotvas' Republican affiliation was not a factor in hiring him for the Chief Deputy position. The deposition testimony supports this proposition.

McCrerey also contends that Allen testified at deposition that political affiliation was not a requirement either for the Deputy Administrator or the Chief Deputy positions. The cited deposition testimony is too ambiguous to support that view of it.

**6.** The plaintiffs place substantial reliance upon the approach adopted by the Second Circuit in *Savage v. Gorski,* 850 F.2d 64, 69 (2d Cir.1988). In *Savage,* the Second Circuit appeared to grant substantial deference to the state's determination that a position is or is not subject to patronage decisions in defining the applicability of the "policymaker" exception. *Id.* at 69. The Court held that unless a party can show " 'special circumstances' (as in *Elrod* or *Branti* ) which would

This is because the fundamental issue implicated, and defined, by the doctrine is a federal constitutional one which, of course, is not controlled by state law or policy. *Bergland,* 626 F.2d at 879 ("The content and scope of constitutional rights—their minima and maxima—are the special province of the courts.") That view, of course, comports with basic notions of federalism which require that the boundaries of a federal constitutional right be ascertained by federal law. Of course, legitimate state interests present a factor to be taken into account in defining the reach of the controlling federal constitutional principle. However, the matter, ultimately, is a question of federal law. *Stott,* 916 F.2d at 142–43. Indeed, as the First Circuit explained in *Goyco de Maldonado v. Rivera,* 849 F.2d 683, 688 (1st Cir.1988):

> If the employer [the public entity] could determine, absolutely and in all events, whether political loyalty is an appropriate qualification for a given position by the relatively simple expedient of passing a rule or enacting a by-law, then *Elrod–Branti* would soon fall into oblivion. It is the Constitution which, in the last analysis, must tell the tale.[7]

For these reasons, McCrerey's assertion that state law and policy preclude the application of the *Elrod–Branti* doctrine are in error.[8]

Mindful of the Fourth Circuit's command that the determination is to be "[w]hether the position at issue, no matter how policy-influencing or confidential it may be, relates to 'partisan political interest [or] concerns'" in that it involves "governmental decision-making on issues where there is room for political disagreement on goals or their implementation," *Stott,* 916 F.2d at 141–42, the court concludes that the positions here fall within the reach of the *Elrod–Branti* doctrine, notwithstanding the provisions of state law cited by McCrerey which, if taken alone, might warrant a different result.

A most critical issue in the conduct of any government is its control of the business, occupations and professions in which its citizens engage. And, of these, DPOR, regulates the practice of professions and the pursuit of occupations. The scope, content and implementation of regulations affecting those practices and pursuits were not only central to the 1993 gubernatorial election, they implicate one of the core issues facing government (state and federal) today: How far can—and should—government reach? How, on what schedule and to what extent that goal is achieved in the regulation of the professions and occupations are matters of importance both to those whose conduct is regulated as well as to those whose affairs—and hence their lives and liberty—are affected by the practice and pursuit of the regulated professions and occupations.

---

make deference to such electoral and legislative determinations inappropriate, the court should accept those judgments." *Id.* That degree of deference, however, appears to be greater than that accorded by the Fourth Circuit and the other decisions cited above and, indeed, has not been consistently relied upon by the Second Circuit.

7. McCrerey argues that the state rule or law should be treated as a factor in the analysis only when it provides that the government office is a patronage position and that, when the state classification provides to the contrary, it should be considered dispositive, thereby precluding the *Elrod–Branti* analysis. This approach, while not illogical, is not adequate because the federal constitutional analysis would ultimately turn on the content of a state law or statement of policy. That, of course would contravene the fundamental principle that the content and scope of federal constitutional rights are matters of federal constitutional law.

8. Although not articulated in this form, the result sought by McCrerey perhaps is that the defendants are estopped from claiming the protection of the *Elrod–Branti* doctrine because of the provision of state law and policies cited earlier and because of the deposition testimony of Allen and Kotvas. And, although McCrerey does not plead an estoppel of that sort, there is a certain basic equity in it. However, the interposition of estoppel here, or in like circumstances, would lead soon to the elimination of the *Elrod–Branti* doctrine because decisions of state legislatures, state administrators and individual hiring officials would not be measured by the objective tests set by *Elrod,* refined by *Branti* and applied by *Stott.* Instead, they would be measured, perhaps even controlled by state law, and that is not the way to secure the important federal constitutional protections for government and for public employees which the *Elrod–Branti* doctrine seeks to guarantee.

· It is not necessary to consider the conspiracy charge under 42 U.S.C. § 1985.

The reach of those, and other, fundamental governmental functions was put squarely to the people of Virginia in the 1993 gubernatorial campaign. Following the election, the new administration sought to curtail the regulation and the taxation of businesses, occupations, and professions—two thirds of which (professions and occupations) lay within the scope of DPOR. Hence, the positions here involved held within their grasp issues "involving governmental decisionmaking" on which there was "room for political disagreement on goals on their implementation." And, in this important area of government, there is no room for serious doubt that—as to the positions of Deputy Administrator and Chief Deputy of DPOR—"party goals or programs affect the direction, pace or quality of government." *Stott,* 916 F.2d at 141–42. Furthermore, the positions here at issue require the holder to be policymakers, privies to confidential information and communicators. Hence, the factors which the federal constitutional analysis must take into account override the countervailing influence of the state law and policy statements on which McCrerey relies.

Thus, under the federal constitutional principles as evinced in *Elrod–Branti* and their progeny, including *Stott v. Haworth,* if, as McCrerey contends, the termination of her employment as Deputy Administrator or the refusal to interview her for Deputy Chief of DPOR were politically motivated, that would have been constitutionally permissible. Hence, the claim which McCrerey asserts in her Amended Complaint lacks its predicate: a constitutionally impermissible encroachment on her First Amendment rights. Accordingly, even if the court accepts McCrerey's view of the evidence respecting the basis for the employment decisions she here challenges, the defendants are entitled to summary judgment because, as a matter of law, those facts do not entitle McCrerey to prevail.

### C. Qualified Immunity

■ Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings. *Karsten v. Kaiser Found. Health* *Plan,* 36 F.3d 8, 11 (4th Cir.1994). However, considering the somewhat unusual presentation of the *Elrod–Branti* doctrine here and taking into account that the issue of qualified immunity enjoys a rather unique amenability to appeal, this case presents one of those unusual circumstances where it is appropriate to articulate an alternative ground of decision.

■ "The doctrine of qualified immunity attempts to reconcile two potentially conflicting principles: the need to deter government officials from violating an individual's federal civil rights and the need for government officials to act decisively without undue fear of judicial second guessing." *Akers,* 998 F.2d at 225. In order to accommodate these competing concerns, *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) established that "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "The standard is objective, based on what a reasonable official would or should have known and thought in the same circumstances, given the state of the law at that time." *Pounds v. Griepenstroh,* 970 F.2d 338 (7th Cir.1992). Accordingly, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity. Indeed, "[t]he tolerance thus accorded by the qualified immunity defense to 'good faith' mistakes of judgment traceable to unsettled law, or faulty information, or contextual exigencies, is deliberately designed to give protection to 'all but the plainly incompetent or those who knowingly violate the law' in order to avoid undue inhibitions in the performance of official duties." *Pritchett v. Alford,* 973 F.2d 307 (4th Cir. 1992) (citations omitted).

■ When considering whether the plaintiff has asserted a violation of a clearly

established right, "the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Wiley v. Doory,* 14 F.3d 993, 995 (4th Cir. 1994). However, "[t]he fact that an exact right allegedly violated has not earlier been specifically recognized by any court does not prevent a determination that it was 'clearly established' for qualified immunity purposes." *Pritchett,* 973 F.2d at 314.

■ The task at hand is to ascertain the clearly established law at the time of the challenged employment decisions which are alleged to have infringed McCrerey's First Amendment rights. *Akers,* 998 F.2d at 226. This requires consideration of the right and the controlling legal articulation of it in the context of the particular positions involved. Here, even if the Court has erred in deciding that the Deputy Director and the Chief Deputy are within the scope of the protection afforded by *Elrod–Branti,* it certainly could not be said that this right was so clearly established in 1994 that a reasonable public official should have known that taking political considerations into account in making employment decisions impacting either of these positions was constitutionally impermissible. As demonstrated by the reasoning of this opinion, resolution of the constitutional issues in this case requires a delicate balancing. And, as the Fourth Circuit explained in *Di-Meglio v. Haines,* 45 F.3d 790, 806 (4th Cir.1995), where the relevant inquiry requires "particularized balancing" which is "subtle, difficult to apply, and not yet well defined" it will be "only infrequently" that the right at issue is "clearly established." Consequently, the defendants would be qualifiedly immune from a damages award.

### CONCLUSION

The motion for summary judgment will be granted.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.